**In re Juan Raul BALDERAS & Elia Lisa Balderas, Debtors.**

No. 02–55740–C.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

April 20, 2005.

law. This Court's jurisdiction is not at issue.

J. Todd Malaise, San Antonio, TX, for Debtors.

1. Bankr.Case No. 04–50145–C. The legal issues involving attorneys' fees there raised are

DECISION ON MOTION REQUESTING ALLOWANCE OF ATTORNEYS' FEES

LEIF M. CLARK, Bankruptcy Judge.

This is a decision dealing primarily with post-confirmation attorney's fees sought by debtors' counsel. The debtors filed a motion seeking modification of their plan because they had fallen behind on plan payments, due in part to a loss of job. The modification sought to further extend the term of the plan to deal with their having fallen behind on their plan payments. The motion also sought attorneys' fees of $350 for the preparation and presentation of the motion. The motion was approved, and an order entered on March 24, 2005. This decision addresses the question of post-confirmation debtor's attorneys' fees sought in that case, an issue which is already under submission in another case, *In re Morin*.[1]

The background of this case provides a factual predicate for the court's ruling. While not entirely typical, the history of this case helps to highlight some of the important policy issues that have to be taken into account in formulating rules for handling post-confirmation fees in chapter 13 cases in general.

### Factual Background

The original plan in this case was confirmed in February 2003, and called for payments to numerous secured creditors for consumer items, as well as distribution to their mortgage lender from a pre-petition mortgage arrearage. Unsecured creditors were to receive a distribution of 48%. The debtors' financial situation was dire. Mr. Balderas was unemployed when they filed, and was receiving unemployment benefits of $1,144 a month. Mrs. Balderas worked for the Floresville Inde-

resolved by this decision. A separate order will be entered in that case.

pendent School District, where she took home $951 a month. They had a 7 year old daughter. Their budget reflected a monthly mortgage payment of $731, a food budget of only $300 a month, utilities totalling $314, and transportation costs of $182 (car insurance, gas, and auto upkeep)—though they showed no motor vehicles on their schedules. Their monthly expenses totaled $1,595. When they filed, they were in arrears on their mortgage for approximately $3,000. Their plan proposed to cure the arrearage with a monthly distribution out of the plan payment of $87.16. They also planned to pay off a number of consumer items that were also secured, including a refrigerator, a TV, a computer, a vacuum cleaner, and a washer/dryer. Their plan proposed to pay their net disposable income into the plan, at $418 a month.

When the plan was confirmed, debtors' counsel was awarded a "flat fee" of $1,800 ($200 had been paid by the debtors themselves when the case was filed). The flat fee is expected to cover the cost of preparing the pleadings (including the schedules and the plan), working up a budget with the debtors, developing a plan, representing the debtors at the first meeting of creditors (where problems with creditors and the trustee are usually worked out), and getting the case to and through confirmation. Counsel also understands that the fee is designed to assure that the debtors will have the benefit of counsel throughout the case, so that debtors can consult with their lawyers throughout the case without fear of additional charge. The flat fee is generally paid at the rate of $85 a month, but the trustee's office makes a lump sum initial distribution from funds on hand (plan payments are made by the debtors even before the plan is confirmed, so there are normally funds on deposit

with the trustee at confirmation). In this case, that initial distribution was $418. Regular payments of $85 commenced in April 2003, and would have continued until the balance of the flat fee was paid. That means that the distributions to debtors' counsel were scheduled to continue through September 2004 (and a small "stub" payment for the balance in October 2004)—a little over 18 months.

Almost immediately after confirmation, problems were revealed with the debtors' budget projections. In addition to the plan payments, the debtors were also obligated to stay current on their mortgage payments post-petition. *See* 11 U.S.C. § 1322(b)(5) (allowing for the curing of pre-petition defaults, but calling also for "maintenance of payments while the case is pending ... on which the last payment is due after the date on which the final payment under the plan is due"). The budget submitted by the debtors shows income and expenses, and a net figure which is supposed to equal the plan payment. Included in the debtors' expenses is the monthly mortgage payment. According to the budget, the debtors were ostensibly able to both stay current on their mortgage and make their plan payment. In fact, the debtors were *not* able to make their mortgage payment (indicating that something was wrong with the budget projections of the debtors). By March 2003, the mortgage lender had filed a motion to lift stay, claiming that the debtors were behind on their post-petition mortgage payments for three months (including March). At the lift stay hearing, a deal was struck, whereby post-petition payment defaults (which were actually *higher* than had been alleged in the motion, by the time the lift stay hearing was held) were to be added to the plan, reducing payout to unsecured creditors to 27%.[2]

2. The motion to modify, in this case, also added an additional unsecured claim for

$1,000 that had not been included in the

The plan payment was increased from $400 to $540 a month.[3] The cost of this fix to the creditors of the estate was $900 ($450 to respond to the lift stay, and another $450 to modify the plan).

Later that year, the debtors asked for a moratorium in plan payments, alleging that Mr. Balderas had lost his job but would not be eligible for unemployment until the end of November.[4] The motion was granted in January 2004, excusing the debtor from making payments for two months, and extending the plan to 62 months.[5] This pleading cost the estate another $295.

The next entry on the docket is somewhat confusing: another motion to modify the plan to incorporate post-petition mortgage payment defaults was filed in January 2004, but evidently addressed the same payment defaults as were addressed in the original motion to modify (which had already been granted in July 2003). Nonetheless, this motion too was granted (in February 2004), including another award for $450. Regardless why the motion was filed, both the debtors' attorney and the chapter 13 trustee recognized that an additional award of attorneys' fees was not intended, and no additional fee was paid.

In March 2004, a certificate of default was filed by the mortgage company, meaning that the entire modification process had failed to cure the debtors' problems with their home mortgage. They evidently were not able to stay current with the mortgage payments, triggering a default under the agreed order, and leaving the way clear for the lender to foreclose on their home.

As the debtors were losing their home, it made no sense to continue to make disbursements to the mortgage lender on the arrearages, so the debtors filed (in April 2004) another modification to their plan to surrender the house, take out the mortgage payments, and adjust the plan payments. The payout to unsecured creditors increased to 57% as a result. However, the motion cost the estate yet another $500. This brought the total fees awarded in this case to $3,495 ($1,800 awarded in

---

3. It is not known how the debtors were going to be able to sustain this higher plan payment amount. Nothing changed on the debtors' budget either in terms of income or expenses, and expenses were modest already.

4. Oddly enough, the original schedules showed that Mr. Balderas was not employed as of filing, and was receiving unemployment. When the plan was modified to deal with the lift stay, Schedule I was attached to the motion, and *still* did not reflect any change in his status. Thus, it is unclear what was really going on. The plan payment was being taken out of Mrs. Balderas' paycheck, via a pay order.

5. Because Mrs. Balderas was under a pay order, the moratorium was effectuated by having the trustee refund two months' of plan payments back to the debtors, one in January and one in February 2004. That way, the employer did not have to interrupt or alter the wage deduction from Mrs. Balderas' paycheck.

original plan. However, the primary motivation for the modification was to deal with the new mortgage arrears. This particular sort of "fix" for post-petition payment defaults was authorized pursuant to the Fifth Circuit's decision in *In re Mendoza*, 111 F.3d 1264 (5th Cir.1997). There, the court held that such defaults can be allowed under section 1305 of the Code, and cured via a modification to the chapter 13 plan, pursuant to section 1329, provided the cure was accomplished over a reasonable period of time in the plan as modified. The actual modification is accomplished by filing a motion to modify the plan, on negative notice to creditors. Since the issuance of the *Mendoza* decision, debtors have increasingly relied on this sort of fix as a means of handling such defaults, as it permits the cure to be smoothed out over a longer period of time. Otherwise, debtors need to cure the defaults with cure payments made on top of the existing mortgage payments, often imperiling their ability to stay current on their plan payments.

the confirmation order, plus $1,695 in post-confirmation fees). The current request for attorneys' fees, if granted, would add an additional $350 in post-confirmation fees, bringing the total fees awarded to debtors' counsel (and to be paid out of plan distributions) to $3,845.

Every time fees in addition to those approved in the confirmation itself have been awarded, they have been paid out of next distribution. What is more, every time there was an interruption in plan distributions, which included distribution to debtors' counsel on their flat fee, that missed distribution was rolled over to the next month that funds were available, before any other creditors (including secured creditors) received any distribution. When fees were awarded for responding to the motion to lift stay, the June 2003 plan distribution (then $400) was diverted to paying those fees.[6] The motion to modify the plan (filed to implement the agreement struck with the mortgage lender) also awarded fees, and these were paid out of the July 2003 plan payment. Because distributions on the attorneys' flat-fee award were interrupted, these were caught up in July and August as well.[7]

The moratorium granted to the debtors in early January 2004 resulted in a refund of their plan payment back to them. No distributions were made to anyone in January and February 2004. In March, when distributions resumed, virtually all of the plan payment went to debtors' counsel to catch up for unpaid distributions in the previous two months, as well as to pay for the moratorium.[8]

The motion to modify to surrender the debtors' house was granted in May 2004, reducing the debtors' plan payment from $540 to $462. Until an amended pay order could be filed, the chapter 13 trustee refunded a portion of the June plan payment received from the existing wage deduction order. The balance of monies for that month were distributed to debtors' counsel to partially pay the $500 awarded on this latest motion to modify the plan.[9] July distributions also went to debtors' counsel. With one final disbursement in August 2004, the debtors' flat fee compensation award was satisfied in full. At this point, the debtors' counsel had been paid $3,495.

The debtors separated sometime in late 2004, and Mr. Balderas, who had only re-

---

6. The plan had been modified in July to increase the plan payment to $540, but that increase did not kick in until September 2003.

7. The chapter 13 trustee paid $535 to debtors' counsel in June 2003, $407.68 in July 2003, and $212.32 in August 2003. No disbursements were made to other creditors in June or July. An interest-only distribution was made to the mortgage lender and a secured consumer creditor in August 2003.

8. By this time, the higher $540 per month plan payment had kicked in. Of that amount received in March, $496.80 was disbursed to debtors' counsel. The following month, the law firm received $138.20. In this way, debtors' counsel both received its $295 out of "next distribution" and recouped the $85 a month that it had not been paid in January through March.

9. In June 2004, debtors' counsel received $210.44, all that was left out of the $462 revised plan payment after the refund to the debtor done to implement the reduced plan payment. No other creditors received any distribution that month. In July, debtors' counsel received $354.43, but no distributions were made to other creditors. In August 2004, another $212.13 was disbursed to debtors' counsel. A catch-up payment was made to the secured consumer creditor as well, because there were sufficient funds on hand with the chapter 13 trustee to make such a distribution. In this way, the post-petition fee award of $500 (to be paid out of "next distribution") was satisfied, while the unpaid distribution on the flat fee was caught up as well.

cently got a job, lost it. Because the debtors were separated, a new set of pay orders were filed, splitting the plan payment between them. This reduced the wage deduction from Mrs. Balderas' paycheck from $540 to $231. A new pay order for Mr. Balderas' new employer called for a wage deduction of $57.75 per week. These pay orders actually kicked in December 2004.

Unfortunately, because Mr. Balderas' employment was short-lived, only one week of wage deductions were received by the trustee. That left only the wage deduction from Mrs. Balderas' paycheck, which was too little to fund the plan. In February 2005, the debtors asked for another plan payment moratorium for December 2004 through February 2005, with the expectation that Mr. Balderas would be re-employed, or alternatively, that Mrs. Balderas' wage deduction would once again be increased to its previous level. For this motion, debtors' counsel seeks compensation of another $350. In the meantime, the trustee is making distributions out of the $231 monthly wage deduction still being received from Mrs. Balderas' paycheck. As of this writing, no new pay order has been filed on behalf of Mr. Balderas.

Since the plan was confirmed in this case, distributions to creditors were interrupted or consumed by debtors' counsel fees in June and July 2003 (attorney disbursements), January and February 2004 (moratorium), March 2004 (attorney disbursements), and June and July 2004 (attorney disbursements). Attorney disbursements consumed half or more of the monies available for creditor distributions in August 2003 and August 2004.

## Analysis

Counsel for the debtors seeks fees for having represented the debtors' interests for additional work not contemplated when the original flat fee was approved at confirmation. The argument is that debtors' counsel cannot be expected to perform such unexpected additional services for no additional compensation. Counsel points out that section 330(a)(4)(B) authorizes reasonable compensation for representing the interests of debtors in chapter 13, that the court's local rules do not bar additional awards for post-confirmation services, and that section 1326(b)(1) mandates that such fee awards be paid out of next distribution, ahead of all other creditors, including secured creditors.

At a hearing on another case, in which many of these fee issues were discussed at considerable length (*In re Morin*, Bankr. Case. No. 04–50145), the chapter 13 trustee expressed serious reservations about the practice of paying additional fee awards out of the next plan distribution. So did lawyers for secured creditors, who complained that a combination of moratoriums, post-petition attorneys' fee awards, and plan defaults (and subsequent plan extensions) seriously altered the "bargain" struck when the chapter 13 plan is confirmed. Car creditors are especially hard hit, as their pre-petition note obligations are substantially altered by the chapter 13 process already.[10] Interruptions to the

---

**10.** In chapter 13 in its current incarnation (*i.e.*, prior to changes made in legislation passed by Congress), car creditors are paid out over some or all of the term of a chapter 13 plan based upon the value of their collateral, yielding a "new principal" which is usually lower (often much lower) than the balance then owed on the car note as of filing. That principal is then repaid at a pre-set interest rate of 12%, in order to accommodate the requirements of section 1325(a)(5). The balance of the debt is treated as unsecured. Thus, from the point of view of the car creditor, even if all goes well, the secured portion of its note has been written down while the original term of the note has been extended (and perhaps the interest rate has been reduced as well, depending on the creditor).

distributions they have a right to expect as of confirmation impose unexpected additional losses, both in terms of the lost time value of money and in terms of increased risk of not being paid even the written down amount promised by the plan. *See* discussion *infra.* Mortgage creditors were more sanguine, but that may be due in large part to the substantial leverage they enjoy by virtue of section 1322(b)(2) (which prohibits write-downs of home mortgages) and section 1322(b)(5) (which requires the debtor to maintain monthly mortgage payments on a current basis outside the plan). Mortgage creditors are also more likely to have collateral of a value that equals or exceeds the debt owed to them. Yet even home mortgage creditors face additional risk of loss by the imposition of additional attorneys' fees (and their immediate satisfaction out of plan payments), by virtue of the increasingly prevalent use of *In re Mendoza* [11] to incorporate post-petition mortgage payment defaults into the plan.

There is thus a strong tension built up here. On the one hand, counsel for debtors often is called upon to perform additional services which are arguably beyond the ambit of the original fee award, as a result of problems the debtors encounter after their plan is confirmed. This case is paradigmatic: the debtors were unable to stay current on their mortgage, even though their budget indicated that they would had enough income to stay current. There was no apparent indication that the debtors were behind on their mortgage when the plan was confirmed (though apparently they in fact were). Their problems with the mortgage generated other problems—the increased plan payment created a greater strain on an already tight budget, leading to a moratorium, and

leading later to their losing their home and revising their plan to take out the mortgage arrears payment. No particular change in life circumstance seems to have led to any of these problems. The debtors simply could not afford to actually live on the budget they had proposed, and upon which the plan was premised. Sure enough, the overly optimistic projections did not hold up to reality, causing the aforementioned difficulties.

The debtors have not actually footed the bill for the services they have received, however—their creditors have borne that economic cost. The debtors pay the same plan payment, regardless to whom that payment is distributed. It is the creditors (especially secured creditors) who are directly and adversely affected by the diversion of plan payment distributions to pay the debtors' lawyer for additional services. Not only are creditors required (as a matter of economics) to pay the freight for these services, but, under the current regime, they are also required to forego the regular repayment of their own claims, causing an actual loss in terms of the value of property being distributed to them under the plan (*i.e.,* interruptions in the stream of payments, as a matter of mathematics, decreases the present value of the total of payments promised in the plan, in derogation of the provisions of section 1325(a)(5)(B)(ii) of the Code).

What is ironic in this particular case is that the debtors amended their plan to *add* post-petition defaults in home mortgage payments, in response to a motion to lift stay. The promised "cure" of these post-petition arrearages was then *delayed* in order to first pay the debtors' lawyers' fees of $900, for services rendered in *fighting* the mortgage creditor's motion.

Interruptions to the stream of payments going to that creditor thus impose an added financial loss (and greater risk of future loss) on the car creditor, over and above the "haircut" that chapter 13 already exacts on car creditors.

**11.** 111 F.3d 1264 (5th Cir.1997).

The question of post-petition attorneys' fees in this case raises policy considerations that transcend this case alone. The manner in which such fees are allowed and repaid, spread over thousands of cases in the district, has significant financial ramifications for all constituencies—the debtors' bar (whose cash-flow needs are affected), car creditors, other personal property secured creditors and, to some extent, mortgage creditors (whose rates of loss are affected), and unsecured creditors (whose expected returns can be entirely eliminated by the accretion of post-confirmation fees). The integrity of the system itself is also called into question, as fees are ultimately approved and paid only as ordered by the court. For this reason, the court's decision here cannot be simply limited to its facts. The ruling and its rationale must apply as well to debtor's attorneys' fee requests in all chapter 13 cases before this court. With this policy overview in mind, we turn to an examination of the relevant provisions of the statute itself.

### A. Section 1326(b)(1)

█ We turn first to an examination of the role of section 1326(b)(1). As has already been noted, every time administrative costs are added to the case, creditors suffer, by virtue of the operation of that section, which directs that priority claims under section 507(a)(1) are to be paid either *before* or *at the time of* payments to creditors. 11 U.S.C. § 1326(b)(1). Debtors' counsel, in the *Morin* case, argued strenuously that section 1326(b)(1) requires payment in full of any additional

fees awarded to debtor's counsel out of next plan distribution (*i.e.*, out of next distribution, in the parlance of the motions that debtors' counsel are now routinely filing). Creditors have argued, conversely, that the statute does not *require* the payment of these additional administrative claims out of next distribution because the statutory language at the least affords the court the discretion to order payment of administrative claims *along with* payments to other creditors. They also argued that any diminution in distributions to secured creditors out of the debtors' plan payments would deprive them of adequate protection of their security interests.[12] The arguments require the court to construe the *"before or at the time of"* language in section 1326(b)(1).

Section 1326(b)(1) by its express terms says that "[b]efore or at the time of each payment to creditors under the plan, there shall be paid—(1) any unpaid claim of the kind specified in section 507(a)(1) of this title ...." 11 U.S.C. § 1326(b)(1). The statute permits a court the option of ordering complete payment of allowed administrative expense claims in front of other creditors, or ordering their payment "at the time of" payment to other creditors. Meanwhile, section 1322(a)(2) says that a plan *shall* "provide for the full payment, *in deferred cash payments*, of all claims entitled to priority under section 507 of this title ...." 11 U.S.C. § 1322(a)(2). Reading the two sections *in pari materia*, as one must in construing competing sections of a coherent statutory scheme,[13] the actual payout of claims having priority under section 507 can occur along with payments to creditors under the plan.[14] Most courts

---

**12.** The implication of this argument, from a distribution standpoint, is that debtors would have to *increase* their plan payment to account for the additional fee award, so that distributions to secured creditors would remain unaffected.

**13.** *See United States v. Stewart*, 311 U.S. 60, 64, 61 S.Ct. 102, 85 L.Ed. 40 (1940); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 220–21, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986).

**14.** The term "creditors" refers of necessity to the definitional section of the Code, which

agree with this reading of section 1326(b)(1). *See In re Moses*, 293 B.R. 711, 718 (Bankr.E.D.Mich.2003); *In re Pappas & Rose, P.C.*, 229 B.R. 815, 820 (W.D.Okla. 1998); *In re Cook*, 205 B.R. 437, 443 (Bankr.N.D.Fla.1997); *In re Cason*, 190 B.R. 917, 933 (Bankr.N.D.Ala.1995); *In re Barbee*, 82 B.R. 470, 473 (Bankr.N.D.Ill. 1988); *In re Parker*, 21 B.R. 692, 694 (E.D.Tenn.1982); *but see In re Harris*, 304 B.R. 751, 757–58 (Bankr.E.D.Mich.2004).[15]

The secured creditors' position that their distributions cannot be altered by the satisfaction of the debtors' attorneys' fees rests on their assumption that these distributions represent a form of adequate protection. In this court's view,

however, that position is not sustainable. *See In re Cook, supra* (adequate protection is what is paid to creditor to compensate for depreciation in collateral value *prior* to confirmation). Plan payments to secured creditors, by design, are, in essence, a device by which the collateral is *redeemed* by the debtor, by substituting for that collateral a stream of payments having a present value equal to the allowed amount of the creditor's secured claim. *See* 11 U.S.C. §§ 1325(a)(5)(B); 506(a); *see also In re Stembridge*, 394 F.3d 383, 387 (5th Cir.2004) (holding that "allowed secured claim" in this section is determined by valuing the collateral securing the debt as of the date of the filing of the petition).[16]

---

tells us that a creditor is one holding a claim that arose at the time of or before the order for relief, *i.e.*, a pre-petition creditor. *See* 11 U.S.C. § 101(10). Post-petition administrative claim holders are not included in the definition of "creditor," but are instead a creature of statute by virtue of section 503(b), whose expense claims are then accorded priority treatment under section 507(a)(1).

15. The *Harris* case concluded that a straightforward reading of section 1326(b)(1) demanded that the priority claims be paid *in full* before other creditors could be paid. It read section 1322(a)(2) to mean only that, if the claims could not be satisfied in a single payment, then all plan payments would have to be devoted to satisfying administrative claims until those claims are paid in full, before any distributions could commence to other creditors. With respect to Judge Tucker and his careful analysis, this court does not find the language of section 1326(b)(1) nearly so plain as does he, betraying the real fault with overreliance on "plain meaning" as a rule of construction: plain to whom? As section 1322(a)(2) obviously contemplates (nay, intends by its very terms) that administrative priority claims be paid in deferred cash payments, the reference in section 1326(b)(1) to the payment of "any unpaid claim" can certainly refer to the claim *itself* without adding the words "in full" as does the *Harris* court. So long as *distribution* is made on the claim, consistent with the terms of the plan (which, by virtue of section 1322 already contemplates deferred cash pay-

ments), section 1326(b)(1) is satisfied. Any other reading causes serious conflict with other sections of the Code, including sections 1325(a)(5) and 1322(a)(2). *See* discussion *infra*.

16. The provisions of section 1325(a)(5)(B) technically come into play as an alternative to section 1325(a)(5)(A), which provides that alternative treatment is possible if the holder of the secured claim has "accepted the plan." There is no formal balloting procedure in chapter 13, and hence no formal procedure for determining a creditor's acceptance. It could be argued that, absent an affirmative objection to the plan, the creditor should be *deemed* to have accepted the plan, regardless whether it complies with the cramdown provisions of section 1325(a)(5)(B). *See In re Andrews*, 49 F.3d 1404, 1409 (9th Cir.1995) ("In most instances, failure to object translates into acceptance of the plan by the secured creditor."); *In re James*, 260 B.R. 498, 503 (Bankr.D.Idaho 2001). Another view is that section 1325(a)(5)(B) should be construed to be the default provision with which the debtor must comply, unless some *affirmative* acceptance is received from the creditor. *See Bank One, Chicago, NA v. Flowers*, 183 B.R. 509, 516 (N.D.Ill.1995). In any case, once the plan is confirmed, creditors are at least entitled to expect to receive the payment stream promised in the plan as confirmed, regardless how confirmation was obtained.

If the plan payments are completed, the secured claim is deemed satisfied, and the creditor must then release its security interest on the collateral. *See In re Smith*, 287 B.R. 882, 886 (Bankr.W.D.Tex.2002). By virtue of *Stembridge*, the allowed amount of this claim will not change over the life of the plan (it is set as of the filing date), though it will be reduced by payments received by the creditor.

■ Adequate protection, by contrast, affords the holder of a secured claim compensation for any diminution in the value of the collateral *pending* confirmation of a plan. *In re Cook, supra.* It is deemed to be a temporary measure, ultimately to be superseded by the permanent provisions of the plan itself. While there is certainly a quality of "protection" implicit in the cramdown provisions of section 1325(a)(5)(B), it is not correct to call it "adequate protection," as that term of art triggers the provisions of sections 361 and 362.

There is nonetheless some merit to the secured creditors' arguments, albeit deriving from a different statutory source. Section 1325(a)(5) says, with respect to allowed secured claims, that they are to receive a distribution under the plan of a value equal to the allowed amount of their secured claims. *See* 11 U.S.C. § 1325(a)(5). Interruptions to the stream of payments given to secured creditors under a plan will of necessity alter the present value of consideration paid to those creditors, having a direct impact on the promise that is implicit in the court's confirmation of the original plan.[17] Put another way, post-confirmation alterations in plan distributions can be seen as a *de facto* modification of the plan. Modifications must satisfy all the requirements of section 1325. A secured creditor could argue that the alteration effected by interrupting the stream of payments to pay the debtors' additional attorneys fees requires that the plan distribution scheme be reworked to assure that the creditor receives the present value of its allowed secured claim (set at filing, per *Stembridge*), reduced by payments already made to that creditor. By the same token, once fees *are* allowed, section 1326(b)(1) pretty clearly requires that they be paid either before or at the same time as payments are made to creditors pursuant to the plan, causing an inevitable dilution of the payment stream upon which confirmation was premised.

One way to reconcile these two provisions would be to require a debtor to make a *larger* payment in order to cover whatever additional administrative costs are awarded post-confirmation, thereby leaving the underlying payment (and the distributions to be made out of it) unaffected. That reconciliation, however, does not work because section 1325(b) requires all net disposable income to be devoted to making plan payments. By definition, there is nothing left over from the debtor's budget with which to pay any additional administrative costs allowed by the court.

Notwithstanding the logical force of creditors' arguments premised on sections

---

**17.** This is nothing more than a mathematical observation. A given stream of income has a present value based upon the application of a discount rate to the income stream. Present value is but an expression of the time value of money—a dollar today is worth more than a dollar a year from now. Thus, alterations to the timing of payments received also alter the present value of those payments. If a given creditor's expected distribution for a given month is deferred, either as a result of a plan default or as a result of the monies being redirected to the payment of a new administrative-expense claim, the present value of that creditor's plan consideration has, by definition, been reduced. *See generally* M. SCARBERY, K. KLEE, G. NEWTON, & S. NICKLES, BUSINESS REORGANIZATION IN BANKRUPTCY, Appx. 12B, at 696 & n. 14 (West Group 2001).

1325(a)(5) and 1329(b)(1), then, this court can reach no other conclusion than that section 1326(b)(1) trumps these other sections, imposing a kind of bankruptcy "tax" on creditor distributions.[18] Thus, allowed administrative claims for debtors' attorneys must be paid, at the very least, in deferred cash payments along with distributions to other creditors, even though, as a result, distributions to other creditors (including secured creditors) will be proportionately reduced as a result.

### B. Section 330(a)(4)(B)

█ Because debtors' fees, when paid, will necessarily dilute (at least to some extent) the distributions to other creditors, it is even more important that such fees only be awarded if such fees are reasonable. Section 330(a)(4)(B) states that ". . . the court may allow *reasonable* compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case[,] based on a consideration of the *benefit* and *necessity* of such services to the debtor *and the other factors set forth in this section* [*i.e.,* section 330]." 11 U.S.C. § 330(a)(4)(B) (emphasis added). The "other factors" referenced in subsection (a)(4)(B) can only be those factors set out in subsections (3) and (4) of section 330. Subsection (4) states that subdivision (B) of that section is an exception to the limitation on compensation stated in subdivision (A), such that inconsistencies between subdivisions (B) and (A) are resolved in favor of subdivision (B). In other words, to the extent not inconsistent, the limits in subdivision (A) will apply to attorney compensation requests by debtor's counsel. That section says that compensation should not be al-lowed if they were unnecessarily duplicative or if they were not reasonably likely to benefit the debtor's estate, or were not necessary to the administration of the case.

In addition, all of the factors set out in subsection (3) are relevant to the court's ultimate award because subsection (a)(4)(B) directs the court to consider both the benefit and necessity of the services to the debtor and ". . . the other factors set forth in *this section.*" 11 U.S.C. § 330(a)(4)(B). The words "this section" of necessity refer to the entire section, i.e., section 330, and not just to subsection (4). Had Congress intended to refer only to factors listed only in subsection (4), then Congress would have used the expression "this subsection." Besides, were it to refer only to the factors in subsection (4), an immediate conflict would be generated because of the words "except as provided in subparagraph (B)" found at the beginning of subsection (4)(A). Thus, the provisions of subsection (a)(3) are some of the "other factors set forth in this section," *i.e.,* section 330, that the court properly considers when determining whether to award fees to debtor's counsel in a chapter 13 case.

The factors in subsection (a)(3) are "all relevant factors, *including—,*" followed by five specific considerations, as follows (numbered for convenience rather than lettered):

(1) the time spent on the services

(2) the rates charged for those services

(3) whether the services were necessary to the administration of, or beneficial at the time at which the service was ren-

---

**18.** The general rule of statutory construction applicable to the court's conclusion is that which states that, when statutory provisions appear to conflict, the more specific provision should control over the more general. *See Guidry v. Sheet Metal Workers Nat. Pension Fund,* 493 U.S. 365, 110 S.Ct. 680, 687, 107 L.Ed.2d 782 (1990). Section 1326(b)(1) is the more specific provision in this case, altering the more general requirement imposed by section 1325(a)(5)(B).

dered toward the completion of [the case]

(4) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed, and

(5) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3)(A)-(E). In the chapter 13 context, some of these factors take on less importance, simply because, in the consumer bankruptcy practice, attorneys do not generally have an hourly rate *per se*. Instead, they tend to set a flat fee for specific categories of services. In some ways, their method of billing resembles the way legal services are rendered to consumers outside bankruptcy—set fees for uncontested divorce petitions, or simple wills, or residential leases. Like their counterparts in the non-bankruptcy context, however, they may well charge by the hour or by service for extra services that go beyond the base service. Factors (1) and (2) in section 330(a)(3) seem to presume hourly rate billing, and so are not as relevant in the chapter 13 context.

█ Still, while less relevant, factors (1) and (2) are not entirely irrelevant in the chapter 13 context either. Factors (1) and (2) are but another way of addressing the larger question of what constitutes a "reasonable" fee, mirroring language found in most codes of professional responsibility.

*See* MODEL RULES OF PROF'L CONDUCT R. 1.5; MODEL CODE OF PROF'L RESPONSIBILITY DR 2-106 (1980); TEX. GOV'T CODE ANN., Title 2, Subtitle G-Appendix A-1, Rule 1.04 (Vernon 2005) (Texas Rules of Disciplinary Procedure). Even a flat fee, to be reasonable, should represent compensation commensurate with the nature of the services rendered, and considering the time spent and the actual cost of rendering the service helps a court to evaluate the reasonableness of the flat fee. The services rendered should be performed within a reasonable time, as required by factor (4), regardless the method of billing. Factor (5) is also relevant, though it is often difficult for a bankruptcy judge to get to this sort of information simply because (a) most non-bankruptcy consumer services are rendered in other forums with which the bankruptcy judge typically has little or no contact and (b) the small amount of fees involved for any given service will not justify the expense of taking evidence from "experts" from the non-bankruptcy consumer practice.

█ Factor (3), of all the factors, is the one having the most relevance (and importance) to the allowance of fees to debtor's counsel in the chapter 13 context. In this factor, a court is to evaluate "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of [the case]." *See* 11 U.S.C. § 330(a)(3)(C).[19] Thus, benefit to the estate or necessity of the services rendered

---

**19.** When evaluating the fees of professionals retained by the trustee, this factor *must* be met, else fees *cannot* be allowed. This is because subsection (4)(A) says that a court is *required* to disallow fees if the services are not found to have been reasonably likely to have benefitted the estate, or are found not to have been necessary to the administration of the case. *See* 11 U.S.C. § 330(a)(4)(A). When evaluating the fees of debtor's counsel in a chapter 13 case, by contrast, factor (3) (*i.e.*, whether the services were necessary to estate administration or beneficial to the case) is not a factor which *must* be met as a condition to allowance, because the prohibition on allowance of fees set out in subdivision (4)(A) does not apply to the extent that it is inconsistent with subdivision (4)(B) (the special subdivision governing payment of fees to debtor's counsel in chapter 13 cases). *See id.*

to the administration of the case ought to be considered in determining whether the fees sought are reasonable, even though the first test of reasonableness is still whether the fees were beneficial to the debtor and necessary in order to ensure proper representation of the interests of the debtor. *See* 11 U.S.C. § 330(a)(4)(B). Congress, to be sure, wanted to assure that debtors in chapter 13 cases were adequately represented. Congress was just as concerned, however, that those fees pass the scrutiny of the court, to prevent overreaching on the part of counsel as well as to assure that the interests of all stakeholders in the bankruptcy process would be protected. It must not be forgotten that, at the end of the day, as a matter of simple economics, the debtor is not paying the bill of the services rendered by his or her attorney—the creditors are. The money is coming out of property of the estate, *see* 11 U.S.C. § 1306,[20] money which would otherwise go to creditors. What is more, the money awarded is being paid out of plan payments previously dedicated under the confirmed plan to paying creditors, forcing creditors' recoveries to be either delayed, diluted, or diminished.

■ In short, determining what constitutes a reasonable fee to award as an administrative expense to counsel for the debtor involves evaluating the need of the debtor to have representation on a given matter, the extent to which the flat fee awarded at confirmation is insufficient to compensate counsel for the work expected, the degree to which the services rendered assist in the administration of the case (keeping in mind that the creditors, at the end of the day, are the ones actually paying the bill), and the reasonableness of the fee sought relative to the nature of the services rendered. At least part of the calculus requires examining the circumstances that give rise to the need for representation, and the extent to which that need must override creditors' legitimate expectations that the terms of the plan as originally approved will be honored. The circumstances of a debtor's financial affairs will not often remain static over the five-year term that most plans in this district run. A debtor rightly expects that it will have the assistance of counsel when those circumstances do change, in a way that requires an alteration to the original plan. And counsel rightly expects that it will not have to render unexpected additional services without recompense. By the same token, creditors rightly complain when additional fees resulting from a debtor's own failure to properly manage its affairs cut into the distributions they expected to receive from a confirmed chapter 13 plan.

This case demonstrates that tension. The debtors professed to be able to stay current with their mortgage payments during the case. Yet within months of confirmation (if not actually *prior* to confirmation of their plan), they fell behind on those payments—at a cost of $900 in additional attorneys' fees, assessed against the creditors. By virtue of the way fees have been paid in this division over the last few years, payment of this additional fee award interrupted payments to other creditors, with no concomitant benefit to creditors. To be sure, the debtors needed legal representation if they were to fend off the efforts of the mortgage company to foreclose on their house, and were able to fix the problem by amending their plan to incorporate the new arrearages into the plan. *See In re Mendoza,* 111 F.3d 1264, 1268 (5th Cir.1997) (authorizing such plan

**20.** Property of the estate in chapter 13 includes, in addition to the property specified in section 541, "earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted ...." 11 U.S.C. § 1306(a)(2).

modifications in limited circumstances). The services were, from the point of view of the debtor, necessary. The services were less obviously necessary for the case itself because the plan could have continued without the house—indeed, in this case, the house was given up eventually anyway, though only after another $500 in attorneys' fees to modify the plan to account for the debtors' surrender of their house. A total of $1,400 was spent in a futile effort to save the debtors' house, at the expense of other creditors who did not stand to benefit at all from those efforts.

■ The difficulties the debtors encountered in staying current on their mortgage perhaps could have been anticipated. Staying current on the mortgage payment is an affirmative duty that the Code itself (as well as the plan) imposes on the debtors. If they are unable to sustain that duty, then the plan itself cannot be said to be feasible. Had the chapter 13 trustee or the court known that the debtor was unable to stay current on their post-petition mortgage payments, the plan would not, in all likelihood, have been confirmed in the first place. Imposing additional administrative claims on creditors to cure the debtors' inability to sustain the obligations imposed by the Code itself is not reasonable. On the other hand, changes in circumstances on the part of the debtor make the case stronger for allowing such claims, because a primary purpose of chapter 13 is to afford debtors, within reason, a fair opportunity to keep their homes and their vehicles while maintaining a court-supervised creditor repayment program. Here, it is not clear whether debtors' counsel could have known of the difficulties that the debtors were having with their mortgage payments (though the debtors' budget was, and continues to be, quite thin).

The total of fees incurred for dealing with the debtors' post-petition mortgage default, however, were not reasonable. Counsel charged a flat fee of $450 to respond to the motion to lift stay, and an additional flat fee of $450 to implement the agreement struck with the lender, namely, to incorporate the post-petition defaults into the plan, via a modification. When the debtors fell into further default anyway, the creditors were charged another $500 to modify the plan again, primarily to remove the secured creditor from the plan.[21] Charging for two discrete services as though they were unrelated caused the estate to incur a higher administrative cost than it should have for dealing with this post-petition mortgage default.

A reasonable fee for the services rendered by counsel for the debtors, assuming that such services were indeed necessary not only from the debtors' point of view but in terms of estate administration, would have treated both the response to the original motion for relief from stay and the later modification of the plan to implement the agreement struck as a single set of services, rather than as two discrete service events. A single fee of $650 would have, in the view of the court, properly and appropriately compensated counsel, considering the nature of the services rendered and the time involved, and further considering the equities of imposing that cost on other creditors of the estate. Further, there is some question whether the modification made to adjust the plan to accommodate the surrender of the debtors' home should even have cost the estate any additional fees, given that the office of the chapter 13 trustee typically seeks modification of plans whenever it learns of such surrenders, at no additional administrative cost to the estate's creditors. In short,

---

**21.** It is the court's understanding that, in the usual case, the chapter 13 trustee will propose such a modification, at no additional cost to the estate. Thus, it is arguable that this further modification (and the accompanying fee award) were unnecessary.

administrative expenses of $1,400 should have been more in the range of $650 or so.[22]

Debtors' counsel has strongly argued that it has an obligation to represent the interests of the debtors, whatever the cost, and so should be paid, whatever the cost. Section 330(a)(4)(B) does not go so far, however, and the creditors' interests are also relevant, given that they are paying the bill. It is doubtful that the debtors themselves would have been willing to pay their lawyers $1,400 in a losing effort to hang on to their home had they been forced to pay that money out of their own pocket—especially were they to have received the bill after they had lost their home.

 Fees have also been incurred seeking moratoriums in plan payments during the case. Such motions are technically a form of plan modification, though they have not traditionally been treated as such in this district and division. In reality, such motions have been generally favored both by the chapter 13 trustee and by the courts in this district and division, within limits, in order to accord a measure of flexibility to the chapter 13 process, to take into account the reality that, over a five year period, a lot of unexpected things can happen in a debtor's life circumstances that may justifiably alter his or her obligation to make plan payments regularly. Job losses, layoffs, loss in hours, loss of overtime, uninsured medical expenses, unexpected car repairs, health emergencies for the debtor's dependents—all can dramatically affect the ability of the debtor to stay current. Rather than simply dismissing such cases, allowing a little flexibility so that the debtor can get back on his or her financial feet often proves beneficial to creditors in the long run. For that reason, the cost of seeking such motions is usually a legitimate estate expense.[23] The court has previously ruled that a flat fee of $350 for such moratoriums is reasonable. On review of the docket in this case (and the docket in numerous other cases), that fee is probably high, especially in light of the fact that some moratoriums almost immediately follow confirmation of the plan. A fair balancing that takes into account the interests of both creditors and debtors, as well as the services reasonably contemplated in the fee awarded at confirmation, would require debtors' counsel to seek one such modification as part of the overall flat fee, with additional awards available for subsequent moratorium requests to the extent that such requests are otherwise legit-

22. The court is not here making a *post hoc* disallowance of the expenses already allowed and paid (though it of course could). The present fee request, however, must be evaluated in light of what fees have already been paid. If fees already paid are deemed excessive, then the justification for further fee awards dissipates substantially.

Later in this opinion, the court addresses the manner in which future fee awards are to be sought. This case amply demonstrates why that manner needs to be changed. Currently, counsel seeks a discrete fee for each motion, with no reference to whether other motions might be related, how much in fees might already have been awarded to date, what fee requests might yet be in the pipeline, and the like. What is more, only a thorough review of the docket every time such a request is made in a given motion would reveal whether, in reality, the fee request is reasonable in light of all the circumstances of the case. Unfortunately, the sheer number of such motions filed, coupled with the fact that most such motions are time-sensitive (especially motions for moratoriums and motions to modify plans), makes extended docket reviews a practical impossibility. For that reason, the manner in which fees are requested needs to change.

23. Of course, the qualifier "usually" telegraphs to counsel that some moratorium requests are not legitimate, but are simply employed as a device to delay the inevitable, or to avoid facing the reality that the plan will simply not work.

imate and in the best interests of the estate as well as the debtors. With that sort of adjustment, the flat fee of $350 is easier to live with for such motions.

The cost of other plan modifications, including modifications in response to a trustee's motion to dismiss the case for plan payment defaults, is the most difficult to reconcile, in terms of the competing policy interests of assuring debtors adequate representation and keeping in mind who is paying the bill. The policy issue becomes especially pointed when there is a car creditor in the plan, looking to the plan payment stream for repayment of their claim.[24] On balance, however, if the court ultimately approves a modification as the means of curing a plan default, there is presumptively a finding that the modification is in the best interests of creditors as well as the debtor. With such a finding must come the further implication that the cost of obtaining such a modification is reasonable, assuming that the amount of the fee request is itself reasonable.[25] Traditionally, the court in this district and division has allowed additional fee awards of $500 for such services. Subject of course to the *caveat* that all fee requests must be evaluated in context and not simply in isolation, that level of fee award appears still to be within the range of reasonableness, even though it is imposed mostly harshly on car creditors.

■ It has been argued by debtors' counsel in other cases that creditors are certainly fully aware of the impact of post-confirmation administrative expense claims resulting from these fee awards, and are free to object if they so choose. The fact that they do not is sufficient justification to warrant the fee awards without more, there being no actual case and controversy absent such objection, goes the argument. The court raises the argument here in anticipation of its being raised by way of motion for rehearing (or as an error point for appellate review). The power of the legal point has been overstated and overrated, however. First and foremost, there can be little doubt that there is presented an actual case and controversy, with or without the affirmative objection by *any* creditor (or by the chapter 13 trustee, for that matter). Section 330(a)(4)(B) itself states that "... a court *may allow*" what a court finds to be "reasonable compensation" to debtor's counsel. The court has the discretion to allow or *not* allow such compensation, period, with or without objection. Unlike other sections of the Code, this particular section does not contain the "on notice and a hearing" language which normally telegraphs that, absent objection, a given request for relief can be granted without any significant judicial intervention (beyond signing the order). In addition, section 330(a)(2) gives the court the discretion to award compensation that is less than the amount of compensation requested, even if no one other than the court is inclined to do so.[26] Indeed, a number of courts have held that the court has not only the right but the *duty* to review fee requests even in the absence of objections by any other party. *See In re Busy Beaver Bldg. Centers,* 19 F.3d 833, 841 (3rd Cir.1994).

---

24. With the rewriting of the bankruptcy statute in 2005, some of these concerns may be substantially ameliorated but not entirely eliminated. Thus, what the court has to say here will have continuing vitality under the new statute.

25. By the same token, if the motion to modify is not approved, there is a similar presumption that neither the modification nor the cost of seeking same was reasonable.

26. At most, this proviso can be read to entitle the professional to a hearing before the court reduces a requested fee award. *See In re Pfleghaar,* 215 B.R. 394, 396–97 (8th Cir. BAP 1997) (citing cases).

The court's interest in independently reviewing the issue of post-confirmation attorneys' fees is further motivated by a practical point, made in numerous other hearings on such fees in open court but reiterated here as well. Notwithstanding the negative notice that is contained in every one of the motions in which counsel asks either for additional fees alone or for both relief and additional fees, creditors do not object. But then why should they? One of the more respected recent tomes on game theory explains why. *See* WILLIAM POUNDSTONE, PRISONER'S DILEMMA 201–203 (Doubleday 1992). Professor Poundstone describes the "volunteer's dilemma," in which all persons will benefit if but one volunteer steps forward, but at relatively great cost to the volunteer. He recounts the example given by game theorist Anatol Rapaport. The U.S. Infantry Manual published during World War II instructed soldiers what to do if a live grenade fell into a trench where he and others were sitting: wrap yourself around the grenade so as to at least save the others. If you volunteer, you will surely die, but others will live. If someone else volunteers, you will probably live. If no one volunteers, you and everyone else will die. Which would you choose? Surely die or maybe live? Game theory states that, in all likelihood, no one will volunteer to fall on the grenade.

Poundstone explains that the worst form of the volunteer's dilemma occurs when the volunteer's payoff is almost identical with the catastrophe payoff when no one volunteers:

> You and ninety-nine friends are held captive in a problem box. Every person is in a separate soundproof cubicle. Each cubicle has a button. If you push the button, you die. But if no one pushes the button before the big clock of doom on the wall strikes twelve, everyone dies. The worst possible outcome is for no one to push the button. To you, the next-to-worse outcome is for you to push the button. Then you die, a hero. Unfortunately, there is no guarantee that your death was necessary (someone else might push the button too) or even that it did any good (it is barely possible that *everyone* pushed the button and they all died anyway). *The most desired outcome, of course, is for you to survive by having someone other than you push the button.*

*Id.* (emphasis added).

The Code's scheme for dealing with post-confirmation administrative expenses has some of the qualities of the volunteer's dilemma, though the payoffs are certainly less draconian than the foregoing game-theory examples. As in the above example, creditors do not know what one another are doing with respect to a given motion. Without that knowledge (and the concomitant ability to coordinate a response and share costs), each creditor will wait for someone else to "fall on the grenade" by filing an objection. The creditor that does so must incur fairly substantial attorneys' fees relative to the payoff in order to object, yet the payoff for doing so is relatively paltry—the successful objecting creditor saves only its *pro rata* share of the fee not paid. Given that scenario, it is little wonder that almost no creditor ever files a formal objection to a debtor's attorney's fee request. As a result, all are subject to the catastrophe cost, in the form of delayed payments, increased risk of nonpayment of their own claims later in the case, and, in the case of secured creditors, an actual reduction in the present value of the originally promised plan consideration.[27]

---

27. To put numbers on it that bear some semblance to real world bankruptcy: a creditor wishing to object to a debtor's fee request of $500 would have to retain counsel to file a response, then be prepared to appear at a

In short, unless the rules of the game are altered, creditors do not (and will not, in the main) object to post-confirmation fee requests.[28] To alter the outcome, the rules have to be changed. One way to change the rules is to have the court be the volunteer. The experience of the last few months have taught everyone that that is not a desirable approach, however, because there is a cost for this volunteer too—not a monetary cost, but a time cost. Unfortunately for other players, if this volunteer steps forward, it is the debtors' lawyers who lose because it takes so long to review the docket history of every post-confirmation fee request with the thoroughness with which this particular case history was examined. Fee requests could take months or years to be resolved, if done one by one, case by case. In fact, that approach introduces a new game—chicken.

Another way to alter the rules is either to lower the cost of being a volunteer, or increase the possibility of collective action. The court actually encouraged this alternative last fall, and the chapter 13 trustee convened a meeting of interested debtors' lawyers, creditors' lawyers, and the chapter 13 trustee to discuss an administrative, uniform approach to handling post-confirmation fees of debtors' counsel, with due regard for the relative impact on all interested parties. A hearing was held on a number of pending cases, at which hearing the *ad hoc* committee presented its proposed solution. Unfortunately, one debtor's counsel objected, claiming that the entire process was flawed and unfair and could not be foisted on the bar (or on his law firm). The effort to change the rules to avoid the volunteer's dilemma was trumped by one lawyer's insistence that the game must be played as though there were no volunteer's dilemma.

These observations lend even greater support to the court's conclusion that, at the end of the day, it is the duty of the court to independently evaluate fee requests and to determine their reasonableness, even without affirmative objection by creditors or other parties in interest. Furthermore, the Code itself tells the court to consider other factors beyond simply the needs of the debtors and their counsel before awarding fees. *See* 11 U.S.C. § 330(a)(4)(B). The court thus rejects the contention that creditor interests are not relevant to the court's evaluation of fee requests, as well as the contention that the court *must* approve fee requests as submitted absent the objection of some party in interest.[29]

hearing (or negotiate the withdrawal of the response). Based on fees that have been awarded for routine chapter 13 motions, that cost is probably in the neighborhood of $500. The creditor who objects thus incurs $500 in cost, but enjoys only the *pro rata* benefit of the fee request being disallowed. Other creditors also enjoy the *pro rata* benefit of the fee request being disallowed—but at no cost to them. So which creditor will spend $500 to get a benefit of far less than $500? The volunteer game teaches us that, in all likelihood, no creditor will expend the $500. Each will wait for someone else to volunteer, and no one will. And experience ratifies game theory: creditors never spend the money to object to fee requests. Why should they, when the cost far exceeds the payoff if they volunteer?

28. Indeed, creditors will not object to much of anything post-confirmation, for essentially the same reasons.

29. The court rejects as well the contention that the chapter 13 trustee is not a party in interest with respect to fee requests. As earlier noted, every post-confirmation fee request functions as a *de facto* plan modification, by altering the payment distributions otherwise expected by creditors pursuant to the confirmed plan. Section 1302(b)(2) allows the trustee to appear and be heard at any hearing that concerns, *inter alia,* modification of the plan after confirmation. *See* 11 U.S.C. § 1302(b)(2)(C); *see also In re Ingersoll,* 238 B.R. 202, 209 (D.Colo.1999).

### Developing New Standards for Post–Confirmation Attorneys' Fees

Taking into account the submissions made at the hearing held in *In re Morin,* Bankr.Case No. 04–50145–C, which included input not only from counsel for debtors in this case, but also input from the chapter 13 trustee, other consumer lawyers in San Antonio (on both the debtor and the creditor sides), and the *ad hoc* committee (via their proposal submitted as an exhibit at that hearing), as well as what the court has learned from reviewing the docket in this case (as well as the docket in numerous other cases), the court formulates the following rules for the award of post-confirmation attorneys' fees in this district in this court.[30]

### A. Distributions in Repayment of Post–Confirmation Fee Awards

First, the court addresses the question of the manner in which post-confirmation fees are paid. As has already been noted, the impact of paying these fees immediately, out of next distribution, as has become the practice in recent years, is harsh for creditors. The practice of course assures that the attorney for the debtor takes little or no credit risk, while inflicting new credit risk on the estate's existing creditors, by consuming the next plan payment.[31] The practice has a direct and adverse impact on creditors of the estate, already required to fund the cost of the debtor's representation at their expense. Unsecured creditors find their distributions delayed and sometimes eliminated by the accretion of additional post-confirmation fees, even though quite often they realize no benefit from the services for which the fees were incurred. Secured creditors lose as well because the present value promised to them at confirmation of the original plan is adversely altered every time a new post-confirmation fee award is paid out of what would otherwise go to them. Paying fees out of next distribution at the expense of creditors also increases the credit risk of nonpayment to those creditors.

■ In truth, adding new administrative claims post-confirmation accomplishes a *de facto* modification of the debtors' plan, by virtue of the requirement that any such fee awards be paid, at the very least, along with distributions to creditors out of the plan payment (causing a dilution to the unexpected disadvantage of those credi-

30. The court does not purport to bind its colleagues, either in this district or division. However, in the interests of achieving greater consistency, the other judges have had an opportunity to review the essential conclusions of this decision prior to its entry. Pursuant to this decision, Judges Clark and King have entered a general order for the San Antonio Division of this district, implementing part, but not all, of this decision. While the judges in this decision have always strove for consistency in the administration of their chapter 13 docket, this decision is ultimately issued only by the judge who signed it, and is not binding on Judge King.

31. Without going into excessive detail, one could develop in relatively short order a probability curve at any given point in a case for the likelihood of plan default at any given point in the future. It is a safe bet that the probabilities of default increase as one looks farther out into the future, until a point relatively close to plan completion (at which point the probabilities of default decrease because the payoff of discharge is an incentive to finish the payments, if the debtor has been paying up to that point for so many years already). A payment next month has, in the main, the highest probability of actually being made, while the payment for the month after that is lower by some factor, and so on. Thus, consuming the payment most likely to be made (namely, next month's payment) of necessity imposes increasing risk of nonpayment onto creditors who expected to be paid out of next month's payment, but must now wait until the month after. The more such payments are so consumed by debtor's counsel for fees, the greater the risks of default foisted onto the creditor body.

tors). It is frankly doubtful that Congress ever anticipated additional attorneys' fee awards post-confirmation, given the way section 1326(b)(1) is written. Nonetheless, the statute does not prohibit such additional fees either, and the express language of the statute compels distribution no later than "at the time of each payment to creditors under the plan." 11 U.S.C. § 1326(b)(1). The *de facto* modification that results from such awards forces the court to consider the impact on other creditors of repayment, because section 1329(b) says that "the requirements of section 1325(a) of this title appl[ies] to any modification ..." 11 U.S.C. § 1329(b)(1). One of those requirements is that secured creditors receive, on account of their allowed secured claim, payments of a value equal to the allowed amount of their secured claim, as of confirmation. The Fifth Circuit has explained that this means that the present value calculation runs from the effective date of confirmation (which, in the case of a modification, runs from the effective date of the modification), but the allowed amount of the secured claim is set in stone as of the date of the bankruptcy filing. *See In re Stembridge*, 394 F.3d 383, 387–88 (5th Cir.2004) (allowed secured claim to be treated at confirmation is the allowed secured claim *as of the filing of the case*, adjusted for whatever adequate protection (and, presumably, in the context of post-confirmation modifications, previous plan payments) had been paid up to confirmation). Thus, a secured creditor could legitimately argue for a complete recalculation of its plan distribution every time post-confirmation fees are requested.

Needless to say, the sheer cost of case administration, and the concomitant time delay from having extended hearings to consider these issues every time debtors' counsel seeks an award of fees is simply not practical. A "rough justice" solution that fairly takes into account these considerations better serves the interests

of debtors' counsel, secured creditors, the chapter 13 trustee, and the court. That solution is also one, as it happens, which commends itself as a matter of public policy. When fees are awarded post-confirmation, they are to be paid out of the plan payment, at a rate not to exceed $100 a month. In this way, section 1326(b)(1) is accommodated because the administrative claim is paid *at the same time* as payments to other creditors. Section 1322(a)(2) is also honored because the administrative claim is paid in deferred cash payments. There is some violence to section 1325(a)(5), but, as the court noted, this is at best rough justice. The violence is far less than that now visited on those self-same creditors by the current procedure. The procedure is easily monitored, easily enforced, easily administered, and even-handed, all considerations that are important to the court. Finally, the procedure comports with public policy, more fairly allocating risk of nonpayment amongst all creditors and claimants, rather than unfairly shifting risk of loss onto other creditors.

## B. Manner of Requesting Post–Confirmation Fees Awards

In order to know whether a given fee request is reasonable, a court needs to know more than simply whether a given flat fee is appropriate to a given task. The experience of the court in reviewing the docket in this case amply demonstrates the importance of the larger context in determining whether a given fee request is reasonable. In this case, for example, the actual fees requested for the current motion are only $350. What is not apparent from the fee request, and could only become apparent from a close review of the history of the entire case, is that this fee, if allowed, would bring the *total* fees awarded in this case to $3,895. A fee request that at the very least informed the court

(and other interested parties)[32] of the number of previous fee requests that have been sought in the case, and the total of fees awarded to date would put the court, the chapter 13 trustee, and others, on notice that a closer review of the history of the case might be in order before awarding further fees. That will be the requirement imposed for all post-confirmation fee requests. The request must also disclose whether there are other pending fee requests that have not yet been granted. Finally, the caption needs to the ordinal number of the application for additional fees, thereby disclosing the number of previous requests that have been made. In this way, the court, the trustee, and creditors will be alerted whether a closer examination of the case is warranted.

 Fee requests for responding to motions to lift stay should continue to be made by separate application (though the caption should still follow the numbering protocol described above). Furthermore, if the "fix" for the problem that occasioned the motion for relief from stay involved a modification of the plan, then the application should include a request for compensation that includes both responding to the motion and seeking plan modification, all part of a single response to the specific problem. The motion for modification, in such circumstances, should *not* incorporate a fee request. The range of reasonableness for such fees will presumptively fall in the range of $650 to $750, though of course special circumstances might warrant a higher (or, theoretically, a lower) fee award. The application will have to spell out those circumstances with reasonable specificity to allow the court to evaluate the request without the need to set the application for hearing. Once again, such applications must also disclose what fees have been allowed to date, and what fee requests may also be pending.

## C. Range of Reasonable Fees for Post–Confirmation Services

Finally, there is the question whether all fees incurred should always be approved. Though this seems to place the question unfairly, it actually accurately reflects the current expectations of the bar. As earlier noted, additional services in a variety of consumer areas are typically expected to be paid, notwithstanding a "flat fee" arrangement for a given routine service. That is not at all an unreasonable expectation on the part of counsel in any consumer case, and certainly not at all unreasonable in consumer bankruptcy cases. Counsel may have a significant role in shaping a case so that it is likely to succeed rather than fail, and competent counsel is in fact expected to perform their services with this goal in mind. That obligation does not make counsel guarantors of the success of the case, however. *In re Gutierrez*, 309 B.R. 488, 495 n. 14 (Bankr. W.D.Tex.2004). A rational balance must therefore be struck, affording debtors the right to representation, while protecting creditors from having to pay for the debtor's profligacy, or lack of discipline, or debtor's counsel's inability to craft a realistic plan in the first place. Just as clearly, whatever device is used to strike this balance must be one which is easily administered, for all the reasons earlier noted in this decision.

The Northern District of Texas promulgated a general order in December 2002 relating to the allowance of chapter 13 fees, including fees for post-confirmation services. *See In the Matter of Attorney Compensation and Expense Reimburse-*

---

**32.** The volunteer problem alluded to earlier in this decision is real—but it also does not override the obligation imposed by the Consti-tution to afford all affected parties due process of law.

*ment in Chapter 13 Cases,* General Order No. 2002–03 (Bankr.N.D.Tex. Dec. 2, 2002). The court there set out what matters were contemplated to be included in the base fee awarded at confirmation, then set out flat fees for additional services that might arise post-confirmation. The order also emphasized that counsel were still free to seek fees in excess of those set out in the guidelines, but would have to file a fee application in order to obtain them. The scope of services presumed to be included in the base fee included, *inter alia,* representation of the debtor in connection with lift stay motions, "including two motions, one concerning the debtor's residence and one concerning a vehicle, but not including an evidentiary final hearing." General Order, at ¶ 4.2(e).[33] The scope also extended to include representation of the debtor "on motions to dismiss, including trustee motions to dismiss with prejudice or without prejudice." *Id.,* at ¶ 4.2(f). Also included were requests for plan-payment deferrals [34] and motions for emergency refunds. *Id.,* at ¶ 4.2(i)(2), (3). The base fee approved in this general order was $2,000 for an individual consumer case.

The General Order also contemplated additional flat fees for the following post-confirmation services: plan modifications, $350; motions to sell property, $350; motions to incur debt, $350; responding to motions to lift stay (after the first two presumed covered in the base flat fee), $350. Each of these allowances also included an allowed expense reimbursement of $50. *Id.,* at ¶ 8.

Both judges in the San Antonio Division of the Western District of Texas have recently ruled on the record at confirmation hearings that a base fee for regular consumer chapter 13 cases of $2,500 will be permitted. That is, by the standards promulgated in most districts throughout the United States, a generous fee. That the fee is awarded in the relatively inexpensive (from a cost-of-living point of view) city of San Antonio makes the fee even more generous. This is an early-confirmation division as well (other divisions of the district are not). As a result, there are far fewer pre-confirmation motions to lift stay, and payments to attorneys commence sooner.

The notion that the base fee ought to include the cost of responding to one motion for relief from stay has merit. Recall that the debtor's obligations include the duty to stay current on post-petition mortgage payments. If the debtor is unable to do that, then the feasibility of the plan itself is in doubt—unless there are significant unexpected changes in circumstances that cause the default (loss of job, unexpected illness, and the like). If the cause for the default lies simply with an the debtor's inability to adhere to the plan, or the inaccuracy of the budget, then it seems less fair to pass that cost along to the creditors in the form of an additional administrative cost. Even though the services rendered in that circumstance might be reasonable from the debtor's viewpoint, they would not be reasonable in light of other factors, including "factor 3" of section 330(a)(3). The rule in the Northern District has much to commend it—and that rule still does not bar counsel's asking for an additional fee award if the circumstances dictate it. Again, however, the court is constrained by the realities of

---

**33.** The Northern District is a "late confirmation" district, so such motions are more routinely filed prior to the confirmation hearing. They are far less frequent in early-confirmation districts or divisions, such as the San Antonio Division of the Western District of Texas.

**34.** Historically referred to in this district and divisions as "moratoriums."

administering large numbers of chapter 13 cases. Accordingly, the court concludes that the base fee should include one motion for relief from stay with regard to the debtor's residence, without prejudice to counsel's seeking an additional award on a showing that, *inter alia,* the circumstances that caused the default were of the sort described earlier—unexpected illness, loss of job, other unexpected change in life circumstances.[35]

█ A car creditor's motion for relief from stay is, in almost all circumstances, the result of a debtor's failing to maintain the minimum requirements of chapter 13—a default in plan payments, loss of insurance, or the like. These are minimal protections that car creditors ought to be able to count on, failing which they rightly seek relief from stay. In the view of the court, absent compelling circumstances, it is difficult to justify imposing the cost of responding to such a default on the very creditor who has been the victim of the default. Such fee requests will not be permitted as a matter of course. Instead, they will only be allowed on a showing of compelling circumstances warranting imposition on the stream of plan payments notwithstanding the adverse impact on the car creditor. Otherwise, responding to such a motion will be deemed to be included in the base fee.[36]

█ Plan moratoriums, which are technically plan modifications, are nonetheless a creature of history in this district, a tacit recognition that circumstances sometimes arise beyond a debtor's control (and beyond his or her budget as well) that simply make staying current impractical. In years past, these motions were typically presumed to be part of the cost of representing the debtor, and did not warrant the award of an additional fee. The Northern District's General Order also provides that such services are presumed to be part of the base services covered by the base fee. Recent practice in this district has permitted the recovery of fees for filing moratorium requests, at a flat fee of $350 per motion.[37] When such motions are filed pre-confirmation, however, they will be deemed to be part of the cost of getting the case to confirmation. Furthermore, *one* request for moratorium post-confirmation ought also to be presumed to be included in the flat fee, following in part the practice in the Northern District. Subsequent requests may include a request for fees, though with the *caveat* that, with the requirement that prior fee awards and the number of previous fee requests be disclosed, a pattern of moratoriums is more likely to trigger closer scrutiny by the chapter 13 trustee and the court (as it should).

---

**35.** The court further expects that, when a "fix" for such a mortgage payment default contemplates a modification to the plan, the cost of that plan modification will be deemed to be part of the cost of responding to the motion for relief from stay.

**36.** Some vehicle creditors aggressively seek relief from stay early in a case, in order to trigger adequate protection payments. As this is an early confirmation district, most such motions are not well-taken, and having to respond to them imposes an unfair charge on both the debtors and other creditors. The cost of responding to such motions may not

always be fairly allocated to the base fee, and so might be separately compensable, on application.

**37.** The local bar in the San Antonio Division met with a view to reaching consensus on fees in chapter 13 cases. All constituencies were represented in those meetings. The *ad hoc* committee recommended continuing the practice of paying $350 for the cost of these post-confirmation moratorium requests, further supporting the court's conclusion that amount ought to continue as *prima facie* reasonable for such motions.

 Motions to modify plans currently command a fee of between $400 and $500 in this division of the district. A fee in that range is appropriate when the motion is in response to a trustee's motion to dismiss, given the "scramble" that is associated with the motion. Motions to modify which are designed to implement the resolution of a stay relief motion may not incorporate a request for additional fees, however. Instead, as earlier explained, counsel will be expected to make a single request for fees associated with responding to the lift stay motion, incorporating the services associated with both responding to the lift stay and filing a motion to modify.

Some attorneys in this division file their own motions to modify to address feasibility concerns, and charge the same fee as for other motions to modify. Normally, it is the chapter 13 trustee who informs debtor's counsel of infeasibility problems, and who also furnishes the requisite information needed to make the plan feasible. Thus, some of the work is already performed for the benefit of the estate at no additional cost to the estate. Of course, debtors' counsel still needs to evaluate the debtors' budget, and may need to confer with their client to confirm whether a feasible plan is even possible. By the same token, the task of making the plan feasible is, in reality, but a completion of the confirmation process. It could even be argued that these particular kinds of modifications ought to be included as part of the base fee. In all events, a flat fee for such motions, given these considerations, should not be $500. In consideration of the extra conference such motions impose, but with deference to contribution of the chapter 13 trustee to make the process more efficient, the court finds that a fee of $350 for such motions is reasonable.[38]

Finally, charging $500 for every modification motion, whether justified or not, is not reasonable. Up to $500 may be reasonable for a given modification motion, but the motion is expected to reflect a considered judgment as to what best serves the interests of both the debtor and the estate. Repeated motions to modify are some evidence that counsel has not been exercising that sort of judgment. Thus, it should (and will be) more difficult to continue to recover fees for *seriatim* motions to modify.[39]

### Conclusion Relating to Attorney Compensation in Chapter 13 Cases

 1. The *prima facie* reasonable fee for getting a chapter 13 consumer case to confirmation is $2,500. That fee will, in the usual case, include the preparation of schedules and statement of affairs, the chapter 13 plan, attendance at the first

---

**38.** The issue has arisen on a number of occasions on the docket in other cases. Some attorneys have argued that they run their own feasibility calculations because, occasionally, the chapter 13 trustee's calculation is wrong. The task of awarding a "reasonable" fee, however, includes evaluating whether the services rendered are in fact "necessary" to the administration of the case. Both a Ford and a Mercedes are likely to get one to one's destination, though the Mercedes may be more reliable (and more comfortable). But the Mercedes also costs twice as much. On a cost-benefit basis, debtors' counsel's work seems, in the view of the court to be duplicating the work of the chapter 13 trustee, and is not justifiable absent a showing that the chapter 13 trustee's feasibility calculations are so often wrong that such work is necessary. Absent that showing, the court prefers the Ford to the Mercedes.

**39.** The court repeats that it is fully aware that the circumstances of a particular case may well justify more than one or two such motions, and may also warrant the award of more fees. Counsel is always free in such cases to set out in its fee request the circumstances that justify higher fees.

meeting of creditors, such communication, correspondence, and consultation as is appropriate to properly represent the debtors in order to accomplish the requisite steps to get to confirmation, and filing other routine and quasi-routine motions, such as motions to avoid liens under section 522(f) and filing motions for pre-confirmation payment moratoriums. In addition, the flat fee will include representing the debtor in responding to a motion for relief from stay on the debtor's residence, regardless when such a motion is filed in the case (subject to the extraordinary circumstances exception enunciated *supra*, in which case an application for compensation may be filed separately, stating with particularity the grounds for granting such relief). If a given case generates an extraordinary amount of work (*e.g.*, confirmation is contingent on the prosecution of an adversary proceeding to recover a transfer or challenge the validity of a lien, or requires extensive claims objections, or the like), counsel is always free to request more than the *prima facie* reasonable fee. The trustee will decline to recommend confirmation in such cases, triggering a confirmation hearing at which the fee issue can be presented to the court for individualized consideration.

2. Accepting in part the recommendations of the *ad hoc* committee of local lawyers who met to consider the post-confirmation fee issue,[40] the base fee will be compensated by an initial payment out of first distribution, consisting of the entirety of the first month's plan payment, plus a distribution out of any additional months of plan payments on account with the chapter 13 trustee as of confirmation, in an amount equal to the number of additional months times $100 (an increase over the existing $85 a month recommended by the committee). This arrangement substantially accelerates repayment of the base fee to debtor's counsel, ameliorating the cash flow needs of the lawyer. The balance of the fee (if any remains to be paid) is to be satisfied at the rate of $100 per month from subsequent plan payments as received (also an increase for the current $85 a month now in force). That arrangement is adopted as part of the court's ruling here, and will be implemented by a general order in the San Antonio Division.

3. The practice of "catching up" debtor's counsel out of the next plan payment for distributions not made as a result of nonpayment of a given month (regardless the reason) will henceforth cease. This arrangement unfairly shifts credit risk onto the creditors, and spares debtors' counsel a similar risk. The court's reading of section 1326(b)(1) does not warrant or support this practice. Henceforth, distributions to debtor's counsel will resume on the same schedule as distributions to other creditors under and pursuant to the plan.[41]

4. *Any* request for post-confirmation fees, regardless whether by separate application or, where authorized, within a motion, must disclose in the title of the pleading that there is a request for attorneys' fees. The caption must disclose the ordinal number of the post-confirmation

---

**40.** This is one way to defeat the volunteer problem: change the rules (and the costs of active participation).

**41.** The rationale, should anyone have forgotten by this point, is simple: the risk of default is visited on all persons relying on the plan for distribution. There is little reason to elevate the debtor's attorney's fee beyond the priority that it already enjoys as a matter of statute. If plan payments stop, for any reason, no distributions are made to *anyone*, regardless their priority. When plan payments resume, then plan distributions also resume, in accordance with section 1326(b)(1). In this way, the event of default is not borne disproportionately by secured creditors.

fee request (*e.g.*, first, second, third, etc.). The body of the pleading must disclose the amount of post-confirmation fees awarded and pending to date (excluding, of course, the amount sought in the request itself). The pleading should be sufficiently explicit regarding the grounds for the request to enable the court to evaluate the reasonableness of the request.

■ 5. *No* request for allowance of additional attorneys' fees may request payment out of next distribution, ahead of all other creditors. Instead, any additional fees awarded will be repaid from the plan payment, at $100 per month, until paid.[42]

■ 6. The cost of responding once to a motion for relief from stay with respect to the debtor's residence will presumptively be included as part of the services expected to be rendered in exchange for the flat fee. Compensation will be awarded for responding to such motions only upon a showing that the mortgage default resulted from unforeseen circumstances, such as a loss of job or a medical emergency. Such a request must be made by separate motion setting forth such grounds with particularity.[43]

■ 7. Post-confirmation attorneys' fees for moratoriums may be sought within the body of the motion. The first moratorium request is presumed to be included within the base flat fee awarded at confirmation. Subsequent fee requests (conforming to the pleading requirements set out above) will enjoy a presumption of reasonableness at the rate of $350, though the court may find such requests less reasonable the greater the number of moratoriums requested.

■ 8. A modification in response to cure infeasibility will be deemed presumptively reasonable at the flat rate of $350.

■ 9. Any other motion to modify (other than a modification to implement a cure of post-petition mortgage payment default) can be allowed as a flat fee of not more than $500, subject to the court's determination that the request is reasonable and justified.

The issues raised in this case are issues which are repeated daily in the many chapter 13 cases on the court's docket. The resolution of those issues set out in this opinion are intended to apply not only to this case, but to all chapter 13 cases in this division of the district, subject to the concurrence of Judge King, who also presides here in San Antonio.[44] The rules relating to the maximum amount allowed for compensation on various matters, the manner in which such fees are sought, and the manner in which such fees are awarded will apply to all pending requests for post-

---

42. This provision will apply even if the base fee is still being paid out of the plan payments. Although the general order provides otherwise, the court may consider accelerated payment in the event no secured creditors remain to be paid, or for other special circumstances (*e.g.*, plan payoff, very large plan payments, etc.).

43. If the "cure" of the default involves a *Mendoza* plan modification, the attorney may, by separate application, seek compensation for this extra pleading.

44. The court is aware that the local bankruptcy rules for the Western District of Texas are currently undergoing revision, and anticipates that some or all of the provisions of this decision may make their way into those rules. The court is also aware that the other judges of the district are awaiting this decision, as there is strong interest in adopting a uniform district-wide practice on this important issue. The court's ruling is binding on the parties appearing before this court. This judge cannot, in a single decision, purport to bind his colleagues, however, and makes no pretension of doing so. It will remain for the judges of this district to decide whether they wish to adopt part or all of the provisions of this decision as the rule of decision throughout the district.

confirmation fees in chapter 13 cases on this court's docket, effective May 1, 2005.

In this particular case, as it turns out, the moratorium is essential. The request for attorneys' fees, while troublesome for the reasons set out in this opinion, will be approved, with the caution that further fees for further moratoriums cannot and will not be approved. The fees are directed to be paid out at $100 a month, until satisfied.